# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 18-1455V
Filed: July 15, 2021

| | |
|---|---|
| GAILMARIE HANNA,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>　　　　　　Respondent. | Special Master Horner<br><br>Shoulder Injury Related to Vaccine Administration; SIRVA; Onset; Injection Site; Amended Record |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.
*Voris Edward Johnson*, U.S. Department of Justice, Washington, DC, for respondent.

## FINDING OF FACT[1]

On September 21, 2018, petitioner, Gailmarie Hanna, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §300aa-10-34 (2012), alleging that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") following the receipt of an influenza ("flu") vaccination in her right arm at a Walgreens pharmacy on October 21, 2017. (ECF No. 1, p. 1.) Although petitioner alleged that the injection site was in her right arm, respondent contends that the Vaccine Administration Record ("VAR") filed in this case indicates the injection was in the left arm, opposite the shoulder petitioner alleges to have been affected by a SIRVA. Respondent also disputes that onset of petitioner's shoulder pain was within 48 hours of her vaccination.

On January 21, 2021, petitioner moved for a ruling on the record finding that the injection site of the flu vaccine at issue was her right arm and further finding that she suffered onset of shoulder pain within 48 hours of that vaccination. (ECF No. 54.) For the reasons discussed below, I find in petitioner's favor on both questions. Notably, however, this outcome is based primarily on petitioner's contemporaneous treatment

---

[1] Because this finding contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the finding will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

1

records. Petitioner's submission of amended vaccination records negatively affected her credibility.

**I.      Procedural History**

As noted above, petitioner filed this case on September 21, 2018. (ECF No. 1.) She filed medical records – including the VAR at Exhibit 1 – and a Statement of Completion on October 9, 2018. (ECF Nos. 7-8.) Petitioner filed additional medical records and an affidavit on December 4, 2018. (ECF No. 9.)

The VAR at Exhibit 1 is a preprinted form with a "Walgreens" heading. (Ex. 1, p. 1.) It is mostly completed by hand, except for petitioner's contact information and the type of vaccination to be administered. (*Id.* at 1-2.) There is a prompt for the site of administration ("L/R Deltoid IM"), but it is left blank. (*Id.* at 2.) Instead, a handwritten notation that appears to be an "L" within a circle was written next to a sticker that provides the lot number and expiration date for the vaccine being administered. (*Id.*) The form is signed by "D. Lewis" as the immunizer. (*Id.*)

This case was initially assigned to the Special Processing Unit ("SPU"). (ECF No. 5.) An initial status conference was held with the assigned staff attorney. (ECF No. 10.) During that status conference, respondent's counsel noted that the VAR indicated petitioner's flu vaccine was administered in her left arm while her petition alleged injury in the right shoulder. (*Id.*) Petitioner agreed to look into whether the pharmacy could provide clarification. (*Id.*)

Petitioner subsequently filed Exhibit 11. This exhibit contains two items. Pages 1 and 2 are copies of the same VAR as previously filed at Exhibit 1, but with an added handwritten notation of "RIGHT ARM" next to the original "L" notation. (Ex. 11, p. 2.) That added notation appears to be initialed, but the initials are illegible. (*Id.*) The name "Danielle Lewis" is also written on the bottom right of the same page. (*Id.*) The third page of Exhibit 11 is a very poor-quality scan or photograph of the second page of the Vaccine Administration Record. That copy has a "Right Arm" notation superimposed over the scan (i.e. the notation does not appear to be from the original that was scanned or photographed). (*Id.* at 3.) That notation is dated and again appears to be initialed, although neither is clearly legible. (*Id.*) In an accompanying status report, petitioner reported that she had secured the amended records from the pharmacy herself and offered them "[f]or whatever weight the Chief Special Master may assigned to this record." (ECF No. 12.)

Respondent requested further documents relating to the amendments to petitioner's vaccination record contained in Exhibit 11. (ECF No. 14.) Petitioner subsequently sought and received authority to subpoena Walgreens. (ECF Nos. 16-17.) On July 26, 2019, petitioner filed additional medical records along with records from Walgreens received pursuant to subpoena (Exhibit 13). (ECF No. 22.) The VAR contained in Exhibit 13 matches the record initially filed as Exhibit 1 and the

subpoenaed documents contained no record indicating administration into the right shoulder as indicated in the amended VARs at Exhibit 11. (Ex. 13, pp. 1-2.)

Additional medical records were filed between January of 2020 and March of 2020. (ECF Nos. 31-42.) However, after respondent advised that he would defend the case, it was reassigned to me on February 21, 2020. (ECF Nos. 39-40.) Respondent filed his Rule 4 Report on April 23, 2020. (ECF No. 43.) Respondent primarily raised two issues – that petitioner's injury was in the shoulder opposite that which was reflected in her VAR and that there is not preponderant evidence that onset of her shoulder injury was within 48 hours of vaccination. (*Id*. at 10.) Respondent noted both of these issues to be fatal to a Table Injury claim of SIRVA. (*Id*.)

On May 4, 2020, I held a status conference to discuss the conflicting vaccination records filed by petitioner. (ECF No. 44.) I expressed concern that the amended VARs were not properly authenticated and further that the records subpoenaed from Walgreens did not provide any evidence that the amendments had been officially memorialized. (*Id*.) I ordered petitioner to file an affidavit describing her role in securing the amended vaccination records filed at Exhibit 11 and for petitioner's counsel to file a status report advising as to additional steps that might authenticate the amendments. (*Id*. at 2.) I advised the parties that in my view:

> Petitioner's counsel correctly noted that the conflicting vaccine administration record will have to be weighed against the record as a whole, which includes notations by petitioner's treating physicians wherein she attributes her right shoulder condition to her vaccination. (Such treating physician notations are often given some weight, particularly in instances where a vaccine administration record omits the site of injection.) However, absent evidence suggesting the vaccine administration record itself is unreliable, it will remain the most contemporaneous record of the vaccine injection site and will warrant very significant weight.[2]

(*Id*.)

On August 6, 2020, petitioner filed an affidavit explaining the circumstances that led to her securing of the amended records, including her interactions with her counsel's office and with personnel at Walgreens. (ECF No. 46; Ex. 21.) Petitioner's counsel also advised that a private investigator had been hired to attempt to locate Danielle Lewis, who by that time was no longer working at Walgreens. (ECF No. 47.) However, on October 5, 2020, petitioner's counsel advised that all reasonable efforts to locate Ms. Lewis had been exhausted and failed. (ECF No. 49.)

---

[2] Of note, during this status conference I operated under the assumption that respondent's interpretation of the VAR was correct and that the handwritten "L" was a notation of administration, a point that has now been specifically challenged on this motion. However, the primary purpose of the status conference was to discuss authenticating the subsequently filed amended VARs.

3

On October 6, 2020, I issued an order requiring the parties to file a joint status report indicating whether the parties would like any opportunity to develop the record further with regard to the site of petitioner's vaccine injection. (ECF No. 50.) I advised that petitioner should cooperate should respondent wish to further pursue the investigation started by petitioner to locate Ms. Lewis for purposes of issuing a subpoena. (*Id.*) In response, the parties advised that "[a]t this juncture, neither party requests any further opportunity to develop the record with regard to the site of petitioner's injection. Petitioner requests an opportunity to brief the issue of injection site before the Special Master rules on this issue. Respondent has no objection to petitioner's request." (ECF No. 51.)

On January 21, 2021, petitioner filed a motion seeking a finding of fact based on the written record that: (1) petitioner received the vaccination at issue in this case in her right arm; and (2) petitioner's shoulder pain occurred within 48 hours of her vaccination as required for a Table Injury of SIRVA. (ECF No. 54.) Respondent filed a response on March 9, 2021, urging that I reach the opposite conclusions. (ECF No. 55.) Petitioner filed a reply on March 16, 2021. (ECF No. 57.) Accordingly, petitioner's motion is ripe for resolution.[3]

## II. Factual History

### a. Medical Records

Although I have reviewed the entirety of the medical records filed in this case, only those most pertinent to the two specific issues presented by petitioner's motion will be discussed. Notably, although respondent stresses the complexity of petitioner's prior medical history, he also observes that as of October 3, 2017, a little over two weeks pre-vaccination, an annual physical exam noted petitioner's range of motion to be good in her upper extremities. (ECF No. 55, pp. 2-3 (citing Ex. 4, p. 60).) Because this decision does not address the ultimate question of whether petitioner's injury constituted a SIRVA, it is not necessary to review the prior medical history further. It is also undisputed that petitioner received the flu vaccine at issue in this case at a Walgreen's pharmacy on October 21, 2017. (Ex. 1.)

A week after that vaccination, petitioner presented to the emergency department at Naples Community Hospital complaining of shortness of breath. (Ex. 9, p. 6.) She was diagnosed as having an acute exacerbation of chronic obstructive pulmonary disease. (*Id.* at 10.) The parties agree that this record contains no mention of shoulder pain. (ECF No 54, p. 2; ECF No. 55, p. 3.) Respondent further stresses, however, that the review of systems was noted to be negative for joint pain and muscle pain. (ECF No. 55, p. 3; Ex. 9, p. 6.) Petitioner's physical exam indicated under musculoskeletal

---

[3] I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Secretary of Health & Human Services*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record.").

that petitioner had no swelling and no deformity; however, it does not indicate the scope of exam or confirm that upper extremities were examined. (Ex. 9, p. 8.) Respondent also stresses that triage and nursing notes are not available. (ECF No. 55, n. 1.)

Petitioner next sought medical care on November 28, 2017. (Ex. 2, p. 37.) At that time she presented to Nurse Practitioner Cindi Lukacs with a chief complaint of arm pain and provided a history that "[s]he received a flu shot Oct 21st at the Walgreen in Punta Gorda. She felt no immediate pain and had no redness or swelling but the next day her arm started hurting in the spot where shot was given." (*Id.*) On physical exam, petitioner had normal range of motion, but did have tenderness in the right deltoid without redness, warmth, edema, or bruising. (*Id.* at 38.) An MRI of the right humerus was ordered to rule out an abscess. (*Id.*)

Petitioner presented for her MRI the next day reporting a history of "prolonged pain after flu shot." (Ex. 2, p. 29.) The MRI was interpreted as normal and it was noted that "[t]he soft tissues of the right upper arm are also unremarkable, without edema or fluid collection. No significant, persistent inflammatory response to previous flu vaccination is noted. There is no evidence of shoulder bursitis. No right shoulder joint effusion is seen." (*Id.*)

Petitioner returned to ARNP Lukacs on December 5, 2017, for follow-up regarding her right arm pain. (Ex. 2, p. 9.) The history indicates that "[patient] is here today to review her MRI. [Patient is] still having pain in the area of the injection (deltoid) with numbness/tingling extending down into her fingers." (*Id.*)

The next day, on December 6, 2017, petitioner presented to neurologist Brian Wolff, M.D. (Ex. 6, p. 10.) The history of present illness indicates that "[s]he presents with right upper extremity pain that started immediately with her getting a flu shot on October 21." (*Id.*) Dr. Wolff suspected a mechanical component to petitioner's complaints, but also felt there was an unexplained radicular element and recommended a cervical spine MRI and EMG and NCV. He did not think she had brachial plexopathy. (*Id.* at 12.)

On December 8, 2017, petitioner had a cervical spine MRI which showed osteophytes and disc protrusion at C3-C4 and narrowing of the central canal and neural foramina with anterior fusion performed at C4 C5, and C6. (Ex. 9, pp. 56-57.) Petitioner requested an additional referral on the basis that Dr. Wolff felt her condition was "muscular." (Ex. 2, p. 19.) She was referred to a shoulder specialist. (*Id.*)

Petitioner saw Dr. Ramon DeLeon on December 20, 2017. (Ex. 3, pp. 48-52; Ex. 4, pp. 48-52.) Dr. DeLeon recorded a chief complaint of "[h]aving left arm pain since getting the flu inj 2 weeks ago." (*Id.* at 48.) However, in a more detailed description within the history of present illness for the same encounter, Dr. DeLeon recorded that petitioner was "presenting with pain in the right arm. She said she got an injection for the flu on October 21 in Naples. Right after that she started [to] have pain in the arm

5

with difficulty in movement. No falls."[4] (*Id*. at 52.) Dr. DeLeon's records also contain a vaccination history that includes petitioner's October 21, 2017 vaccination; however it does not indicate the site of injection. (*Id*. at 50.) The history does reflect that petitioner received three prior injections in the left shoulder, a Tdap vaccination administered just three days prior on October 18, 2017, as well as a flu vaccination in 2014 and a pneumococcal vaccination in 2016. (*Id*.)

Petitioner's treatment history continues throughout 2018 and 2019. Petitioner's first appointment with an orthopedist was with Dr. Leslie Schultzel on January 8, 2018. (Ex. 3, p. 38.) Petitioner complained of right-side arm and shoulder pain. Dr. Schultzel indicates that "[s]he relates this possibly with a flu shot. After that, everything started to get inflamed." (*Id*.) Although the exact nature of petitioner's condition continued to be explored, the subsequent records are less illuminating as to the specific findings of fact requested by petitioner. Petitioner does point out, however, several additional instances in which petitioner both continued to complain of a right shoulder injury and attributed that shoulder pain to her flu vaccination. (ECF No. 54, pp. 5-8 (citing Ex. 3, p. 39 (January 11, 2018, to Dr. Schultzel); Ex. 6, p. 6 (January 16, 2018, to Dr. Wolff); Ex. 3, p. 32 (January 18, 2018, to Dr. Schultzel); Ex. 5, p. 35-36 (April 5, 2018, to pain management specialist Robert Ball, D.O.); Ex. 12, p. 1 (April 26, 2019, to Desmond Hussey, M.D.).)

### b. Affidavits and Vaccination Records

When petitioner initially filed medical records in this case in October of 2018, she also filed a notarized letter by Richard Keyster dated July 20, 2018 and addressed to Ashley Raina. (Ex. 7.) Mr. Keyster indicates that Ms. Hanna requested that he recount their flu shot experience. He indicated that in October of 2017 he and Ms. Hanna were running errands together and decided to get their flu vaccinations. He indicated that the Pharmacist by the name of Danielle administered their vaccinations privately in cubicles. His was uneventful, but Ms. Hanna complained on the drive away that her right arm was hurting. Upon inspection, they concluded that "her shot location appeared different than mine." (*Id*.)

Petitioner's first affidavit was subsequently filed in December of 2018 and is dated November 30, 2018. (Ex. 10.) It indicates that petitioner recalls getting her flu vaccination from Walgreens with her friend, Richard Keyster. (Ex. 10, p. 1.) Petitioner averred that "[i]t was given to me by the Pharmacist in my right arm. Almost within minutes it started to ache and, on the drive back to Naples from Punta Gorda my arm increasingly ached and I asked Rick if his hurt too, as I had never had a reaction prior. He responded that his arm did not hurt." (*Id*.) Petitioner further indicated that her pain increased daily and affected her mobility. She initially thought the pain would go away, but "finally realized the pain I was feeling was not normal," prompting her to see ARNP Lukacs. (*Id*.) Petitioner indicated that she called Walgreens on December 5, 2017, and spoke to Pharmacist Jamie Clark who indicated that her injection had most likely hit a bone or muscle. (*Id*.)

---

[4] The specific reference to Naples in this notation appears to be an error. (*See* Ex. 1, p. 1; Ex. 2, p. 37.)

6

Petitioner filed a second affidavit on August 6, 2020. (Ex. 21.)  That affidavit was created in response to my order of May 4, 2020. (ECF No. 44) It is electronically signed and dated July 22, 2020, and seeks to describe the creation of the amended vaccination records previously filed as Exhibit 11 on January 22, 2019. (Ex. 21, p. 3.)

Petitioner indicates that she felt she knew Danielle Lewis quite well at the time of her vaccination as she had been a customer at this pharmacy for many years. (Ex. 21, p. 1.)  At the time of the vaccination, Ms. Lewis was only a few weeks away from giving birth and going on maternity leave. (*Id*. at 2.)  Petitioner indicates that she has historically received her vaccinations in her left arm; however, the Tdap vaccine she received in her left arm at Dr. DeLeon's office shortly before this vaccination was still sore.  She and Ms. Lewis therefore decided to administer the vaccination in her opposite right shoulder. (*Id*. at 1.)

Petitioner adds that "[w]hen I was informed by my attorney's office [that] the record of the vaccine had an L listed on the form with a circle around it, the firm's paralegal suggested that I ask the pharmacist to go [to] the pharmacy and ask that the record be corrected . . . I spoke directly with Danielle at the Punta Gorda location by phone.  She remembered administering my shot in my right arm but she said that she would need to speak with 'corporate.'" (*Id*. at 2.)  Thereafter, petitioner explains how she came to secure the documents filed as Exhibit 11.  To preserve context, it is worth quoting these passages at length.  Petitioner continued:

> The paralegal at my attorney's office asked me to contact the Walgreens to obtain a corrected copy of my vaccine record.  I was unable to drive the 75 miles from Naples to Punta Gorda.  I went to the local Walgreens in Naples for help in getting my vaccine record corrected and I visited there on several occasions. I honestly do not remember the order of those visits but in reviewing the emails from my attorney's office, it is clear that in December 2018, I first went to the Walgreens in Naples for help.  I explained to the technician at the counter that I had received a vaccine in my right arm at the Walgreens in Punta Gorda and that the vaccine was administered by the pharmacist Danielle Lewis and that they could call her to verify that the shot was given in my right arm. I told the technician that I needed clarification that the shot was given in the right arm and asked for a corrected copy of my vaccine record. I was told that only the pharmacist could deal with this issue and that I would need to wait. I was instructed to have a seat as the pharmacy was very busy. After about 45 minutes, I was handed the form that appears at Exhibit 11 page 3. I do not know if the Naples pharmacist actually called the Punta Gorda Walgreens or how the pharmacist produced the blurry copy of the form. I sent this form to my attorney by fax and mail.

(*Id*.)

Petitioner further indicated:

7

> In early January 2019, my law firm's paralegal wrote to me and said that the copy was blurry and the initials were not legible. The paralegal sent me a "clean copy" of the vaccination record and told me to go back again with the more legible copy, have the pharmacist correct it again, and to get a business card of the pharmacist. I went back in January as instructed by my law firm's paralegal. This time the pharmacist refused and told me not to come back. He was quite rude. Nonetheless, I went back later to see if another pharmacist could help me. This time, the counter attendant said she would make the change, but she would not sign the form. She initialed the form and wrote Danielle Lewis' [sic] name at the bottom as the administrator. I was told she had no business card available. I mailed this cleaner version to my attorney and informed her office that this is what happened. This version appears at Exhibit 11 page 2. Because the pharmacist was so rude, I changed pharmacies.

(*Id.*)

### III.  Legal Standard

Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence. A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1). However, the Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule is not absolute. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* The Court of Federal Claims has also observed that "[i]f a record was prepared by a disinterested person who later acknowledged that the entry was incorrect in some respect, the later correction must be taken into account." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting the decision below), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl.

8

381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). Further, the Special Master must consider the credibility of the individual offering the testimony. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, there must be evidence that this decision was the result of a rational determination. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.

## IV. Findings of Fact

### a. Regarding Injection Site

#### i. Party Contentions

Petitioner argues that the original VAR – as filed at Exhibit 1 – does not clearly indicate that the vaccine at issue was administered in the left arm for several reasons: the specific portion of the form that prompts the administrator to note the injection site was left blank; the portion of the form where the "L" notation at issue appears is intended to be filled out prior to vaccine administration, suggesting it may not be related to administration; respondent has provided no evidence corroborating his interpretation of the "L" as indicting an injection site; and even if the notation did mean "left," given that the notation appears in a part of the form intended to be completed prior to vaccination it may be a presumptive notation given that most people are right handed and most vaccinations are given in the non-dominant arm. (ECF No. 54, pp. 9-11.)

Additionally, petitioner argues that to the extent the original VAR is interpreted as indicating a left shoulder administration, it stands alone against the weight of the evidence. (*Id*. at 11.) Petitioner contends that petitioner's medical treatment records, Mr. Keyster's affidavit, and petitioner's own affidavits, overwhelmingly support a finding that the vaccine was administered in the right arm. (*Id*.) In her initial motion papers, petitioner further asserted that her second affidavit adequately explains the origins of the amended vaccine records and that those records read in conjunction with her affidavit further contribute to the whole record as supporting petitioner's explanation of events. (ECF No. 54, p. 14-15.) However, in her reply, petitioner confirmed that she is not relying on the amended vaccination records, though she still maintains petitioner's affidavit adequately explains their origin. (ECF No. 57, n. 1.)

Respondent stresses that when petitioner subpoenaed her records from Walgreens, the document produced in response matched the original VAR initially filed as Exhibit 1. (ECF No. 55, p. 11.) Respondent agrees that the site of administration

9

section of the form was left blank, but contends that the "L" notation that is included on the document "most likely" indicates administration into the left arm. (*Id.*) Respondent suggests that petitioner's interpretation of the record is undermined by her own evidence. Specifically, respondent notes that in seeking to secure amended vaccination records, petitioner's interactions with pharmacy personnel, and the resulting notations seeking to correct the "L" notation, actually confirm the understanding that the "L" notation was an administration site notation in need of correcting. (*Id.* at 11-12.) Respondent further argues that petitioner's interpretation of the VAR notation based on hand dominance is unsupported speculation and that the amended records are unauthenticated. (Id. at 12-13.) Because respondent contends an administration record exists that documents a left shoulder administration, respondent further suggests that it would be circular to rely on petitioner's subsequent treatment records for a right shoulder injury as evidence that her vaccination must have been administered in her right shoulder. (*Id.* at 13.)

      ii. <u>Discussion</u>

Resolving the site of injection in this case based on an evaluation of the record as a whole requires an assessment of the weight to be given four types of evidence: petitioner's original VAR at Exhibit 1; petitioner's subsequent medical treatment records; petitioner's amended VARs at Exhibit 11; and the affidavit testimony available in this case. I will address each in turn.

      1. Original vaccination record

As I previously noted to the parties in a prior status conference, the VAR at Exhibit 1 is the most contemporaneous record of petitioner's vaccination. As such it should ordinarily be given significant weight if it appears reliable. However, the weight afforded contemporaneous records is contingent, at least in part, on their clarity and consistency. "Medical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).

Two prior cases have addressed the accuracy in general of injection site notations from chain pharmacies. *Stoliker v. Sec'y of Health & Human Servs.*, No. 17-990V, 2018 WL 6718629 (Fed. Cl. Spec. Mstr. Nov. 9, 2018) (finding vaccine administration record generated by CVS pharmacy to be unreliable as to injection site); *Mezzacapo v. Sec'y of Health & Human Servs.*, No. 18-1977V, 2021 WL 1940435 (Fed. Cl. Spec. Mstr. Apr. 19, 2021) (finding vaccine administration record generated by Rite Aid Pharmacy to be unreliable as to injection site). In both of those cases, deposition testimony from the pharmacists that administered each petitioner's vaccinations indicated that pharmacy practice is to initially record an injection site location without respect to actual administration for purposes of generating online submissions to process the cost of vaccination through the patient's insurance. Based on that testimony, I have previously concluded that "experience litigating SIRVA claims has shown that pharmacy vaccine administration records are not necessarily reliable in

10

documenting injection site." *Mezzacapo*, 2021 WL 1940435, at *6. Further testimony in those cases indicated that when entering these anticipatory injection site notations, pharmacists favored a notation of "left." *Id*. This does give some limited credence to petitioner's argument that the "L" on this form could likewise have been a presumptive notation more so than would have been likely if the notation had been an "R." It also gives some limited credence to the idea that pharmacies may in general treat lightly the obligation to accurately record the site of injection for the vaccinations they perform.

There are several reasons, however, why these two prior cases are not helpful in resolving this case. First, this case involves Walgreens pharmacy whereas the prior cases involved different pharmacies – namely CVS in *Stoliker* and Rite Aid in *Mezzacapo*. There is no basis for automatically assuming that Walgreens follows any practice similar to the other pharmacies. Second, the erroneous notations at issue in *Stoliker* and *Mezzacapo* were electronically generated. Here, the notation at issue was completed by hand rather than as part of a prepopulated electronic form. (*See* Ex. 1, p. 2.) Moreover, the form itself prompts a handwritten injection site notation by circling the correct site ("L/R Deltoid IM"). (*Id*.) Accordingly, even if Walgreens did follow a similar approach, it is not clear that the notation at issue in this case could be explained by that process. And, third, the outcomes in those prior cases were supported in part by testimonial evidence from the pharmacists that created the records at issue. That type of evidence is unavailable here.

Nonetheless, the VAR in this case presents a separate issue in that petitioner is ultimately persuasive in arguing that it is clear on the face of the document that it was completed irregularly vis-à-vis the injection site. This fact alone is enough to raise a question as to the meaning of the notation at issue. As noted above, "[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475 at *19 (quoting *Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (1991)). Here, the portion of the form prompting identification of the injection site was left blank while a separate notation of "L" appears elsewhere on the document. Moreover, that "L" notation is not included in the administration section of the form and includes no other mark or explanation identifying it as a notation as to administration site.

Given that this document is the record of a vaccination that actually was administered, and given that the vaccination must have been given in either the left or right arm, respondent's interpretation of the "L" as denoting the site of administration is very plausible and clearly has the benefit of seeming to be common sense. However, as reasonable as respondent's interpretation seems, the actual state of this vaccination record necessarily means that respondent's interpretation likewise involves an inferential step, especially because the notation in question does not appear in the administration portion of the form. Respondent also argues that petitioner's interpretation is undermined by the fact that petitioner and the pharmacy personnel that offered amendments to the record treated the "L" as notation of injection site in need of correcting. (ECF No. 55, p. 11.) For the reasons discussed below, however, I assign no weight to the amended records because there is insufficient evidence that the

11

amendments were made with any knowledge of the creation or original meaning of the notation at issue.

With regard to the site of vaccination, the VAR at Exhibit 1 is best characterized as ambiguous. Accordingly, I conclude that it is not entitled to significant evidentiary weight on that question.

### 2. Petitioner's subsequent treatment records

As is evident from the above-discussed factual history, from the very first appointment at which petitioner sought care for her alleged shoulder injury, she repeatedly and consistently reported to multiple care providers that she was suffering a right arm/shoulder condition that was related to a flu vaccine she had received in that shoulder. (*See* Ex. 2, pp. 9, 29, 37; Ex. 3, pp. 32, 38, 39, 52; Ex. 5, p. 35-36; Ex. 6, pp. 6, 10; Ex. 12, p. 1; *but see also* Ex. 3, p. 48 (*compare to* Ex. 3, p. 52).) Prior cases have determined that such a pattern of treatment and attribution is probative evidence regarding the site of injection. *E.g. Mezzacapo*, 2021 WL 1940435, at *7; *Desai v. Sec'y of Health & Human Servs.*, No. 14-811V, 2020 WL 4919777, at *13-14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Mogavero v. Sec'y of Health & Human Servs.*, No. 18-1197V, 2020 WL 4198762 (Fed. Cl. Spec. Mstr. May 12, 2020).

Respondent argues that this is circular. Respondent contends that "in the presence of a vaccination record that indicates that the flu vaccine was, more likely than not, administered in petitioner's left arm, it is insufficient for petitioner simply to argue that because her records show that she *subsequently* complained of pain in her right arm, then the vaccine must have been administered in her right arm." (ECF No. 55, p. 13. (emphasis original).) This argument misses a critical point. Petitioner's medical records do not *only* record that she suffered a right shoulder injury. They also specifically record that petitioner received a vaccination in her right arm and associated her shoulder pain with that vaccination.[5]

The treatment records are probative on this issue because they are contemporaneous documents recorded by disinterested persons memorializing the fact that petitioner at that time understood her vaccination to have been administered in her right shoulder, believed that to be relevant to assessing her condition, and sought treatment accordingly, capturing essentially a present sense impression regarding the nature of petitioner's condition that supports her allegation that her vaccination was administered in the right arm.[6] This is consistent with the longstanding understanding in

---

[5] Petitioner's contemporaneous reports to her treating physicians can inform the factual question at issue regardless of whether her understanding of the cause and effect is probative of the medical question of causation. *Accord Wonish v. Sec'y of Health & Human Servs.*, No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991)(stating with regard to § 300aa-13(a)(1) that "it seems obvious then that not all elements must be established by medical evidence" and that "vaccination is an event that in ordinary litigation could be established by lay testimony. Medical expertise is not typically required.")

[6] To be clear, F.R.E. 803(1) indicates that a present sense impression is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."

12

this program that contemporaneous medical records are valuable because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. Petitioner would have little incentive to misreport the location of her vaccination in this context, because it could interfere with the process of arriving at a correct diagnosis and treatment plan. Moreover, these reports were made consistently, on multiple occasions to multiple medical providers.

Respondent's argument to the contrary was also informed in part by his interpretation of the VAR at Exhibit 1 as clearly reflecting administration of the vaccine at issue into the left arm. However, for all the reasons discussed above, that is not the case as that record is ambiguous and therefore carries reduced evidentiary weight. Additionally, the reports petitioner provided to her physicians are also notable for further identifying the vaccination at issue by additional detail. When petitioner first sought treatment for her injury, she specifically identified the vaccination at issue not only as having been administered at Walgreens, but also as having been administered on October 21st in particular. (Ex. 2, p. 37.) In contrast, petitioner did have a Tdap vaccine administered in her left deltoid at her doctor's office just three days prior on October 18, 2017. (Ex. 4, p. 50.) The medical records explicitly evidence that petitioner was not confusing her two vaccinations.

Especially because petitioner's initial VAR is ambiguous and entitled only to reduced weight, I find that petitioner's subsequent medical treatment records, in which she contemporaneously reported repeatedly and consistently that her injury was related to flu vaccination in her right arm, are the best evidence of record with regard to the correct location of petitioner's injection.[7]

### 3. Amended Vaccination Records

As previously discussed, on May 4, 2020, I held a status conference in which I expressed concern regarding the lack of authentication of the amended VARs at Exhibit 11. (ECF No. 44.) I ordered petitioner to file an affidavit describing the origin of the documents and to explore further authentication. (*Id.*) Petitioner's subsequently filed

---

Accordingly, subsequent treatment records would not offer any present sense impression of the administration of the vaccination itself. Rather, "present sense impression" is referenced in the sense that the relevant histories of present illness reflect petitioner's perception of the nature of her condition at the time of her encounters with care providers. In any event, in this program evidence does not need to satisfy a hearsay exception to be considered. *E.g. Wright v. Sec'y of Health & Human Servs.*, No. 16-498V, 2020 WL 6281782, at *19 (Fed. Cl. Spec. Mstr. Sept. 25, 2020) (noting that "the rules of evidence do not prohibit admission of bald hearsay in the Vaccine Program"), *mot. rev. granted, rev'd on other grounds*, 146 Fed. Cl. 608 (2019).

[7] I have also considered the fact that there is an intervening emergency department record related to a different condition, but do not find that it has significant bearing on the reliability of the records of petitioner's actual treatment for her shoulder complaint. That record is discussed in further detail with regard to the question of onset.

13

affidavit authenticates the documents insofar as it describes how she obtained them; however, petitioner's account demonstrates the amended VARs to be entirely unreliable. In her affidavit responding to my order, petitioner acknowledged that the amendments were not made by Danielle Lewis, the pharmacist that administered the vaccination. (Ex. 21.) In fact, petitioner averred that she spoke with Ms. Lewis and Ms. Lewis was not willing to create an amended vaccination record without speaking to "corporate." (*Id*. at 2.) Moreover, in seeking the amended records petitioner did not go to the same Walgreens location where her vaccine was administered. (*Id*.)

There is no evidence of record that the pharmacist with whom petitioner spoke was a colleague of Ms. Lewis, knew Ms. Lewis at all, spoke to Ms. Lewis, or is in any way aware of Ms. Lewis's habits and practices. There is no evidence of record to suggest that Walgreens has any relevant policy that would support this pharmacist's ability to interpret Ms. Lewis's method of completing the form, which as discussed above, appears facially irregular based on the structure and prompts of the form.[8] There is no evidence of record to suggest that the pharmacist had access to additional records beyond the original VAR.[9] Moreover, petitioner specifically averred that "I do

---

[8] To the extent any of these specific deficiencies could have been further addressed by additional testimony, I gave petitioner an opportunity to identify additional steps that could be taken to authenticate the VAR amendments at Exhibit 11. (ECF No. 44.) Although petitioner reported that she made efforts to locate Ms. Lewis, she did not offer any indication that she ever sought further evidence from any of the other pharmacy personnel contacted by petitioner with regard to the amendments at issue. (ECF Nos. 47-49, 51.) Significantly, Ms. Lewis may have had information relating to the original record, but it is the unnamed pharmacist and counter attendant who have personal knowledge regarding the basis for their amendments to that original record. Because petitioner offered no indication that she sought these witnesses out and did not otherwise develop the record in that regard, there is no reason to assume they would have provided evidence favorable to petitioner. In *Mezzacapo*, respondent had urged an adverse inference against petitioner's arguments because petitioner failed to subpoena a specific consent form from the administering pharmacy. 2021 WL 1940435, at *7 (citing *Omni Moving & Storage of Virginia, Inc. v. United States*, 27 Fed. Cl. 677, 693 (1993), *on reconsideration* (June 2, 1993), *dismissed*, No. 93-5203, 1994 WL 745410 (Fed. Cir. Jan. 25, 1994) for the proposition that "[u]nexplained failure to call any known non-hostile person who has direct knowledge of the facts being developed by the party raises the inference that the testimony would be unfavorable or at least would not support the case.") In that case, I declined to impose an adverse inference both because the relevant witness was deposed and because the petitioner had previously subpoenaed the relevant records, albeit unsuccessfully. *Id*. at 8. Other special masters have, however, declined to fully credit "self-serving" amendments to medical records where, *inter alia*, the physician who amended the records was not made available to testify at hearing. *Chinea v. Sec'y of Health & Human Servs*., No. 15-095V, 2019 WL 1873322, at *30, n. 40 (Fed. Cl. Mar. 15, 2019), *mot. rev. den'd*, 144 Fed. Cl. 378 (2019).

[9] Prior cases have suggested that some vaccination records, including consent forms that indicate the site of administration, are retained by individual pharmacies on premises. *Stoliker*, 2018 WL 6718629, at *3 (explaining that "Mr. Ahmed testified that the consent forms are not retained electronically, but that a physical copy is stored on site at the pharmacy."); *Mezzacapo*, 2021 WL 1940435, at *4 (pharmacist testifying that she reviewed the petitioner's consent form prior to her deposition). The existence of additional local records could hypothetically provide a basis for an amendment even without Ms. Lewis's direct involvement. However, because petitioner was at a different location it is less likely that the person to whom petitioner spoke had access to such local records if they existed. Petitioner did represent that the pharmacist somehow secured a blurry scan of her original record (Ex. 21, p. 2), but this does not suggest the existence of, or access to, any *additional* records and, as explained above, the only potentially relevant notation on the original record is an "L." Petitioner subpoenaed Walgreens for

14

not know if the Naples pharmacist actually called the Punta Gorda Walgreens or how the pharmacist produced the blurry copy of the form." (*Id.* (referring to Ex. 11, p. 3.).) Petitioner secured a second amended record (Ex. 11, pp. 1-2) from a counter attendant, but the basis for the counter attendant's amendment is not disclosed, petitioner's affidavit reports that a counter attendant would not have been authorized to make such an amendment, and petitioner indicated the attendant refused to sign the amendment or provide identification. (Ex. 21, p. 2.)

Accordingly, petitioner's affidavit makes it patently clear that the amended records filed at Exhibit 11 cannot be relied upon as there is insufficient evidence that they were made by any individual with knowledge of petitioner's vaccination or otherwise constitute genuine or trustworthy corrections to petitioner's original record. Ultimately, in her reply brief, petitioner acknowledged that she would not rely on these documents in the face of respondent's challenge to their authenticity. (ECF No. 57, n. 1.) Accordingly, I assign zero weight to the amended vaccination records at Exhibit 11.

4. Affidavit testimony

As discussed above, the best type of evidence available in this case is petitioner's body of contemporary treatment records. The reliability of petitioner's statements as contained in those records is accepted based on the specific context of the doctor-patient relationship as well as the fact that these records were generated by others contemporaneously to the recorded events. The context of the three affidavits filed in this case is in contrast. These documents were specifically drafted for use in prosecution of petitioner's claim. Contemporaneous records prepared independently of litigation are often more reliable than testimony of interested parties. *See Rogero v. Sec'y of Health & Human Servs.*, 748 Fed. Appx. 996, 1001 (Fed. Cir. 2018); *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993) (stating that "written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."). Here, petitioner's own actions in furtherance of her claim not only failed to demonstrate the reliability of the amended vaccination records, they also reflect poorly on her credibility generally, which necessarily then casts doubt on the veracity of the purported recollections contained in her affidavits.

Based on petitioner's own description of how she secured the amended records, she had good reason for knowing or strongly suspecting that the amendments were not based on any verification of the circumstances of her vaccination. Petitioner explained that she repeatedly pressed different pharmacy staff when she came upon resistance to the creation of an amended record. (Ex. 21, p. 2.) When she initially contacted Ms.

---

vaccination records and the documents produced by Walgreens do not reflect the availability of any additional documents that indicate petitioner's vaccine was administered in her right arm. (Ex. 13.) Accordingly, the fact that the pharmacist apparently secured a scanned copy of the original record does not in any way confirm the basis for the amendment.

15

Lewis, Ms. Lewis was unwilling to provide an amended record at that time. Instead, petitioner went to a different pharmacist at a different location who produced an amendment the provenance of which she agrees she could not confirm. (*Id.*) When she returned for a second amended record, the pharmacist refused to amend the record again. Instead, she secured an amendment from a counter attendant despite having been previously told that a counter attendant was not authorized to assist with such an issue. (*Id.*) She acknowledged that she is unaware of whether the pharmacy she visited – which, again, she acknowledged to be a different pharmacy location – ever contacted the pharmacy where the vaccine was administered at any time, let alone the specific pharmacists who administered the vaccine and completed the paperwork. (*Id.* ("I do not know if the Naples pharmacist actually called the Punta Gorda Walgreens or how the pharmacist produced the blurry copy of the form").)

Given the process involved, no reasonable person would understand the amended forms petitioner secured to constitute genuine verification of the site of her vaccine injection. Yet, petitioner confirms that she passed these documents along to her counsel for filing in this case. Counsel's status report accompanying the filing contains some of the course of events described in petitioner's affidavit, but omits critical details such as the fact that Ms. Lewis refused to be directly involved herself, that petitioner subsequently went to a different pharmacy, that petitioner was unaware of how the first amendment was generated, and the fact that the second amendment was unauthorized in that she was specifically told that the counter attendant should not be amending vaccination records. (ECF No. 12.) Despite this lack of complete explanation, petitioner offered these documents "for whatever weight the Chief Special Master may assign to this record." (*Id.*) It was not until a year and a half later, after the case was reassigned to me and I directly ordered petitioner to swear under oath as to the authenticity of these documents, that she revealed the full details that so strongly suggest that these documents are unreliable. This represents a distinct lack of candor. It also demonstrates a willingness on petitioner's part to knowingly rely on specious "evidence" to support her claim.

I note that petitioner stressed the role of her counsel's paralegal in repeatedly instructing petitioner to pursue these amended records and in receiving the records back from petitioner. (Ex. 21, p. 2.) That petitioner's counsel's office prompted the production of these unreliable documents and then agreed to file them is also concerning.[10] Nonetheless, counsel's participation in the process does not absolve

---

[10] As can be seen from the above, stepping outside the lines of ordinary discovery is likely to raise far more questions than it resolves and risks substantial damage to the petitioner's credibility and her claim, a matter of which counsel should be cognizant. Absent proper handling and authentication, amendments to records clearly will not be credible. This is not the first time this firm has been involved in cases where amended records have been proven to be a thorny issue with negative consequences to petitioner. *Tehennepe v. Sec'y of Health & Human Servs*, No. 19-34V, 2021 WL 1366088 (Fed. Cl. Spec. Mstr. Mar. 3, 2021). Conversely, the same counsel was likewise involved in the above-discussed *Stoliker* and *Mezzacapo* cases wherein the issue of incorrect vaccine administration forms was resolved favorably to the petitioner through proper discovery, though *Mezzacapo* likewise had an additional unauthenticated vaccination record the origin of which was never explained. *Mezzacapo*, 2021 WL 1940435, at n. 3. Accordingly, counsel should be well aware that when a petitioner believes his or her records to include errors, it is far better for that petitioner to avoid self-help and instead raise the issue promptly and

16

petitioner given her direct role in securing and presenting the documents for consideration in this case.[11]

In light of the above, while I accept as reliable the contemporaneous statements made by petitioner in the course of her diagnosis and treatment, petitioner lacks sufficient credibility on the current record to have her affidavit statements taken at face value as credible statements of recollection regarding the merits of this case.[12] Accordingly, I give zero weight at this time to petitioner's affidavits as evidence supporting the findings of fact at issue on this motion. I do, however, give some weight to Mr. Keyser's sworn statement that he recalls visualizing petitioner's injection site after she complained about right shoulder pain following her vaccination. (Ex. 7.) Mr. Keyser's credibility as a witness is not directly implicated by petitioner's own litigation tactics.

### iii. Conclusion and Finding of Fact

For the reasons explained above, I find based on consideration of the record as a whole that there is preponderant evidence that petitioner's October 21, 2017 flu vaccination was administered in her right arm. This is based on the ambiguity of the initial VAR filed as Exhibit 1 and the evidence contained in the contemporaneous treatment records. Mr. Keyser's recollection is also generally consistent with these contemporaneous records. However, in reaching this conclusion I do not rely on either the amended VARs at Exhibit 11 or petitioner's affidavit testimony.

---

forthrightly with the court so that steps may be taken through the litigation process to address the issue. It would not necessarily be unreasonable for petitioner's counsel to preliminarily investigate the circumstances by, for example, informally interviewing a pharmacist to determine if the pharmacist has relevant information. However, ultimately securing that information, whether by affidavit, in response to written discovery, or by deposition, should proceed by more formal and verifiable means, ideally accomplished under the authority of the Vaccine Rules and with notice to respondent. Vaccine Rule 3(b)(2) tasks special masters with "affording each party a full and fair opportunity to present its case" and Vaccine Rule 7 allows for both formal and informal discovery between the parties. Moving forward it is highly likely that absent compelling authentication (such as an affidavit from the original author of the record or a certification from a records custodian) I will immediately strike any amended record(s) not secured through cooperative effort by the parties pursuant to Vaccine Rule 7.

[11] If the status report at ECF No. 12 represented counsel's complete understanding at that time regarding the origin of the documents at Exhibit 11, then the lack of candor may have been petitioner's alone. However, even if counsel was aware of the complete facts as later revealed by petitioner's subsequent affidavit, counsel was still acting on behalf of petitioner in filing the amended records, which petitioner knew from her own actions lacked sufficient reliability.

[12] This conclusion is based on petitioner's lack of candor in litigating this case as well as on the fact that petitioner's statements are unexamined affidavit statements as opposed to live testimony. However, because the remaining evidence of record was otherwise sufficient to resolve this motion even in the absence of any reliance on the recollections reflected in petitioner's affidavits, it was not necessary to conduct a fact hearing prior to resolution of the motion. *See* n. 3, *supra*. Should this case later proceed to a hearing, petitioner's credibility may be reassessed as needed after respondent has had an opportunity to fully explore petitioner's truthfulness on cross examination.

### b. Regarding Onset

i. <u>Party contentions</u>

Petitioner contends that her contemporaneous treatment records for her shoulder condition "overwhelmingly" suggest that onset of her pain began "almost immediately" after vaccination and that her physicians repeatedly associated the pain to her vaccination.[13] (ECF No. 54, p. 16 (citing Ex. 2, p. 9, 29, 38; Ex. 3, pp. 32, 52; Ex. 5, p. 36; Ex. 12, p. 1).) Respondent acknowledges that when petitioner first sought treatment for her shoulder complaint on November 28, 2017, she reported that her pain began the day after vaccination. (ECF No. 55, p. 15 (citing Ex. 2, p. 37).) However, respondent argues that petitioner's emergency department encounter of October 28, 2017, contradicts that report. (*Id.* (citing Ex. 9, pp. 6-10).) Respondent argues that as the most contemporaneous medical record to vaccination, it should be credited over other conflicting evidence.[14] (*Id.*)

ii. <u>Discussion</u>

As explained in the discussion regarding the site of injection, petitioner is correct that once she began seeking treatment for her shoulder pain, she repeatedly and consistently placed onset in close proximity to her October 21, 2017 flu vaccination in histories provided to multiple medical providers over a multi-year treatment period. Respondent does not challenge this and, in fact, cites only a single emergency department medical record from October 28, 2017, that he argues is to the contrary. Accordingly, the weight of medical record evidence favors an onset of shoulder pain within 48 hours of vaccination unless respondent is correct that the October 28, 2017 emergency department record deserves disproportionate weight.

This precise issue has been previously addressed. In *Tenneson v. Secretary of Health and Human Services*, the petitioner alleged that she had suffered a SIRVA following a flu vaccination administered on October 6, 2015. No. 16-1664V, 2018 WL 3083240 (Fed. Cl. Spec. Mstr. Mar. 30, 2018). The *Tenneson* petitioner subsequently presented to the emergency department for an unrelated urinary tract infection on January 22, 2016, about three months prior to the first time she would later seek treatment for her alleged SIRVA. *Id.* at *3. As in this case, the emergency department record in *Tenneson* had some suggestion that the petitioner had no complaints relevant to a SIRVA; however, the *Tenneson* special master reasoned that "in the undersigned's experience thorough physical examinations are not conducted in the ER setting for issues beyond or unrelated to the reason for the visit. The undersigned notes this is in contrast to a general or physical examination conducted by a primary care physician or

---

[13] Petitioner also seeks to rely on her affidavit testimony. (ECF No. 54, p. 16.) However, for the reasons discussed above, I am not assigning weight to petitioner's affidavits.

[14] Respondent also argues that petitioner's pain and reduced range of motion were not limited to the shoulder in which she allegedly received her vaccination and, therefore, it is not clear that she actually suffered a Table Injury of SIRVA. (ECF No. 55, p. 15.) While this may be an issue that requires further litigation, it is beyond the scope of petitioner's motion and will not be addressed herein.

18

orthopedist." *Id*. at *5. Respondent moved for review of that determination on the basis that the special master's reasoning was speculative, but the Court of Federal Claims found that the special master's analysis was reasonable, based on the known function of emergency medicine, common sense, and accumulated experience reviewing medical records. *Tenneson v. Sec'y of Health & Human Servs*., 142 Fed Cl. 329, 340 (2019).

Subsequent to *Tenneson*, the Federal Circuit has further clarified that there is no "presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs*., 997 F.3d 1378, 1383 (Fed. Cir. 2021). In *Kirby*, the Federal Circuit was critical of the idea that a notation of a neurological exam that mentioned only the absence of dizziness constituted evidence that a complete neurological exam had been conducted. (*Id.*) Following *Kirby*, a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.

Here, the evidence of record provides even less support for respondent's contention than was present in *Tenneson*. In *Tenneson*, the petitioner waited five months before seeking treatment of her alleged SIRVA. Her emergency department encounter was itself three months prior to her subsequent SIRVA treatment. Here, petitioner sought treatment for her alleged SIRVA within a month of her vaccination (Ex. 2, p. 37), which is consistent with how many people seek treatment for SIRVA. *See, e.g. Lang v. Sec'y of Health & Human Servs*., No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020)(explaining that "absent additional factors, respondent's suggestion that an 11-week delay in seeking treatment in itself constitutes and evidentiary deficiency is not persuasive" and noting that "respondent's expert has conceded that there is no such thing as an 'appropriate' time to seek treatment" for a SIRVA); *Smallwood v. Sec'y of Health & Human Servs*., No. 18-291, 2020 WL 2954958, at *10 (Fed Cl. Spec. Mstr. Apr. 29, 2020) (Chief Special Master noting that it is "common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own.")

Additionally, the emergency encounter record in *Tenneson* included a physical examination section that purported to have negative findings with respect to the petitioner's extremities. *Tenneson*, 2018 WL 3083140, at *3. Here, the physical examination records only that petitioner's musculoskeletal system broadly was negative for swelling or deformity. (Ex. 9, p. 8.) This is actually consistent with petitioner's subsequent SIRVA treatment records. Petitioner denied any swelling when she first reported her alleged SIRVA symptoms. (Ex. 2, p. 37.) Respondent relies instead on the review of systems which indicates under musculoskeletal that petitioner denied joint and muscle pain. (Ex. 9, p. 6.) Again, however, this is a very broad review and does not specifically address petitioner's extremities.

Petitioner's October 28, 2017 emergency department record is a contemporaneous medical record that is facially trustworthy as far as it goes. It is not wholly without evidentiary value. However, given the nature of emergency medicine,

19

the fact that petitioner was presenting for an unrelated condition, the lack of detail contained in this specific record, and the cumulative weight due petitioner's subsequent treatment records, which were specifically in treatment of the injury at issue and are in themselves clear and consistent, this record alone is not sufficient to cast doubt on the history of present illness reflected in petitioner's subsequent records.

       iii.  Conclusion and Finding of Fact

In light of the above, there is preponderant evidence that the pain symptoms constituting petitioner's alleged SIRVA began within 48 hours of her October 21, 2017 influenza vaccination. This conclusion is based on assessment of the contemporaneous medical records as a whole. Petitioner's affidavit was not relied upon in reaching this conclusion.

## V.   Conclusion

Petitioner's motion is **GRANTED**. Findings of fact are hereby made as stated in Sections IV(a)(iii) and (b)(iii).

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master